# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5369-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.M.W.,

      Defendant-Appellant,

and

S.O.F..

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.O.F.,

      a Minor.

_____

Submitted May 11, 2020 – Decided June 5, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0085-19.

Joseph E. Krakora, Public Defender, attorney for appellant, A.M.W. (Robyn A. Veasy, Deputy Public Defender, of counsel; Laura Orriols, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Casey Jonathan Woodruff, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.M.W. (Amy) appeals from a judgment of guardianship terminating her parental rights to her son T.O.F. (Tommy)—born in 2012—and awarding guardianship to plaintiff, New Jersey Division of Child Protection and Permanency (Division), which was entered after a two day trial.[1] Amy argues the Division failed to meet its burden to establish by clear and convincing evidence that her admitted substance abuse impacted her ability to care for

---

[1] We repeat the pseudonyms defendant used in her merits brief to protect Amy and Tommy's privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12); R. 5:12.

Tommy, and the trial court's termination decision was "not supported with adequate, substantial and credible evidence." Instead,

> [b]ecause there [was] no actual abuse or neglect in this case, the removal and continued separation of mother and child [was] premised on the idea of a substantial risk of harm from the mother's struggle with addiction. However, the [Division] failed to produce any evidence that the allegation that the child was in danger of his parental relationship with his mother was reasonable. There were no contacts with unsavory individuals, dealers or users. There were no house parties or times when the child was left unattended.

We disagree. The trial court's conclusions are supported by clear and convincing evidence and the best interests of the child are served by termination of Amy's parental rights; thus, we affirm.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We accord even greater deference to the trial court's fact-finding "[b]ecause of the family courts' special jurisdiction and expertise in family matters . . . ." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (first alteration in original) (quoting Cesare, 154 N.J. at 413). We will not disturb the trial court's factual findings unless they are "so wide of

the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

"Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of . . . review." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). The trial court's legal conclusions and the application of those conclusions to the facts are subject to plenary review. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The Legislature has declared, as a matter of public policy, "[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a). Parental rights, however, are not inviolable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). Before parental rights may be terminated, the Division must prove the following four prongs by clear and convincing evidence:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

See also A.W., 103 N.J. at 604-11. The standards "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

Amy contends the trial court erroneously found the first statutory prong was met by evidence that Tommy was born methadone-exposed; he was twice removed from Amy by the Division; Amy admitted to drug use while caretaking Tommy; and an expert opined Amy had "parenting deficits." She argues that

5

evidence does not clearly and convincingly prove "the relationship between Tommy and his mother was detrimental to his health and development."

The record, however, demonstrates that and other evidence established the first prong. In determining if the Division met its burden with regard to the first prong, we consider not only "whether the parent has harmed the child[, but also whether the parent] may harm the child in the foreseeable future." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 113 (App Div. 2004). The Division "does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect'" to satisfy this prong. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). "Serious and lasting emotional and psychological harm to children as the result of action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. "When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate

treatment for that condition, the first subpart of the statute has been proven." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013).

The record evidence, including Amy's admissions, supports the trial court's findings of fact, delineated in its fifty-six-page written decision, upon which we base our decision. The trial court determined Tommy's "safety, health and development" was endangered by his relationship with Amy. Tommy's methadone exposure at birth evidenced Amy's long-standing, ongoing drug abuse that she admitted started when she was fourteen-years-old[2] with marijuana use, progressed to heroin use at age fifteen and then to cocaine use in 1997.

The first Dodd removal[3] in May 2014, took place after Amy tested positive for cocaine. The Division substantiated her for abuse or neglect after she admitted using four to five bags of cocaine at least once per week while caretaking her children. The second removal occurred after Amy—who left Tommy with B.H., whom she identified as his godmother—was admitted to a hospital in January 2017 and tested positive for cocaine, methadone and opioids.

---

[2] Amy was born June 7, 1975.

[3] Prior to obtaining a court order, the Division may remove a minor in an emergency. N.J.S.A. 9:6-8.21 to -8.82 (the "Dodd Act"); see also N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

A-5369-18T3

Although Amy denied drug use, she admitted going to a methadone clinic and later admitting to ingesting cocaine and heroin. In fact, she tested positive for all three substances during a drug screen performed four days prior to her hospital admission.

The removals showed not only the duration of Amy's drug use, but that her use took place—as she admitted—while Tommy was in her care. The trial court's finding that Amy "admitted to the abuse and neglect of [Tommy] because of a 'significant history of substance abuse, spanning at least seventeen years, indicating a pattern of substance abuse and relapsing on cocaine and heroin, while remaining in the caretaking role of [Tommy,]'" is well-supported by the record.

Despite her expressed desire to complete an intensive outpatient program, maintain sobriety, mental health treatment and continued compliance with substance abuse treatment, Amy: "was inconsistent in attendance and testing positive for illicit drugs" while in treatment at Integrity House in August 2014; was admitted to an Integrity House inpatient substance abuse program that month, but was discharged in September 2014 because she had a physical altercation there; re-entered the program in October 2014 and "agreed to comply with [the] substance abuse program at Integrity and any next[-]level

recommendations; participate in parenting skill classes; and to comply with mental health treatment"; in February 2015, expressed a desire to leave the program, where she "was receiving parenting skills, individual therapy and psychiatric medication monitoring" because "she did not realize it was a long-term program"; nonetheless completed the Integrity House program in March 2015 "and was discharged to complete further treatment at the Integrity House – WISE program."

Unfortunately, in June 2015, two of Amy's three urine screens were positive for cocaine and she had missed treatments; Amy admitted relapsing in May 2105; in July 2015, four of Amy's six urine screens were positive for cocaine and one for alcohol, and she missed treatments. The WISE program did not report any further positive drug screen and, although it reported in October 2015 that Amy's attendance was poor, she successfully completed the program requirements in December 2015. After testing negative the following month, Amy and Tommy were reunited in February 2016, and the Division closed its case in November 2016.

Two months later, the Division received a referral after Amy's hospital admission. It ultimately effectuated the second Dodd removal after she tested positive for, and admitted, heroin and cocaine use. She entered an intensive

outpatient program at East Orange Substance Abuse Program in February 2017. She tested positive in February, March and April, and was discharged from the program. Thereafter, she attended the Sunrise House substance abuse program for relapse prevention and group therapy, where she was reported compliant in August and December 2017. She also engaged in psychiatric treatment at Newark Beth Israel Medical Center "for major depressive disorder and post-traumatic stress disorder, but acknowledged that she was not taking the prescribed medication." And, although she missed or canceled without adequate notice three scheduled appointments with CYFS – YDC[4] (CYFS), in November 2017, CYFS reported she attended consistently; in March 2018, CYFS reported that though she missed some sessions, Amy "appeared motivated to process her trauma and maintain her sobriety."

In April 2018, the Division's permanency plan to again reunify Amy and Tommy was approved because she "was compliant with services; she was receiving individual therapy and parenting skills classes at CYFS; substance abuse treatment and methadone maintenance at Sunrise House[;] and she then had unsupervised visits" with Tommy.

---

[4] CYFS is an acronym for Clinic for Youth & Family Solutions. YDC, an acronym for Youth Development Clinic, is a section of CYFS with which the Division contracts to provide services.

Supervised visitation was reinstated, however, after Sunrise House reported Amy tested positive for cocaine. In June 2018, Amy advised the Division that she did not want to take prescribed psychotropic medication because she felt it was not needed. That month, CYFS reported Amy missed, without adequate notice, three scheduled appointments in May and June, it would not schedule additional appointments and would close Amy's case. Later that month, YDC reported Amy's "expressed desire to continue with treatment were inconsistent with her actions"; despite being warned on June 19 that it would close her case if she missed any more appointments, she missed one on June 26. On July 10, 2018, YDC closed Amy's case for lack of attendance.

In September 2018, Sunrise house "reported that despite [Amy's] initial success, she exhibited problematic behaviors, had misdirected anger and was combative and argumentative," and recommended her care level be changed to intensive outpatient treatment. Amy advised the Division "she could not go to Sunrise Clinical because the clients were 'really crazy.'"

An October 4, 2018 court order noted Amy tested positive for various controlled dangerous substances in March, May, June, July, August and September. Her treatment at Sunrise had stagnated in November 2018 to the point that she was transferred to American Habitare & Counseling, Inc. That

month, the Division also noted Amy was not addressing her mental health and referred her to Rutgers Behavioral Early Intervention Support Systems. In February 2019, Habitare reported Amy had not taken prescribed medications. The following month, Habitare reported Amy tested positive for cocaine twice in February and once in early March but tested negative later in March; it also said Amy met her monthly requirements of meeting with her primary counselor and in group session, and submitting to urine screens. In April 2019, Habitare reported Amy was not compliant, inconsistent and tested positive for cocaine. On June 25, 2019, Habitare reported:

> To date, [Amy] ha[s] not met her monthly requirements. [Amy] has not attended treatment for the month of June with the exception of once. [Amy] has [attended] for the month of May as scheduled, but has not attended any group session as required. [Amy] is monitored for uds for the month of May and June as follow[s]: May 9[] and 13[] tested negative for illicit substances. May 21[] tested positive for cocaine and May 29[] tested negative. June 5[] tested negative for illicit substances. June 11[] tested positive for cocaine, and June 19 tested positive for oxycodone. [Amy] is also scheduled to see the program APN every [three] months and is prescribed Prazosin 2 mgs. For Night Terrors. [Amy's] attendance at treatment program has not been consistent and she is not an active participant of treatment program. Patient [h]as not attended any scheduled groups as a requirement of treatment program.

Not only do the trial court's findings support that Amy's drug use while Tommy was in her care presented a danger to his safety and health, her continued drug use and failures to address both her substance abuse and mental health issues evidence a continued danger for the foreseeable future.  See C.S., 367 N.J. Super. at 113.  Amy's inability and, at times, unwillingness, to obtain and complete appropriate treatment caused a risk of harm to Tommy, including his continued impermanent home life.  See H.R., 431 N.J. Super. at 223.

As Dr. Elizabeth Stilwell, whose qualifications as an expert in psychology and bonding were stipulated by the parties and found by the trial court, opined:

> The available history and current data suggests that [Amy] presents with a number of parenting deficits that have not been ameliorated to the point of her becoming a viable parenting option for [Tommy].  Despite being given several opportunities to achieve stability, [Amy] continues to engage in self-defeating behaviors and has not complied with recommended services.  To [Amy's] credit, she appears to love her son and wants to care for him.  Her parenting assessment suggests that she has a rational and factual understanding of parenting and child rearing practices.  However, she lacks the emotional resources and fortitude to achieve stability in her own life let alone a child with emotional and behavioral needs.  Additionally, [Amy] does not appear to appreciate that harm she continue[s] to perpetrate by inconsistently visiting and remaining in contact with her son.  In accordance with prior psychological opinions, [Amy's] inability to engage in services and consistently attend visitation with [Tommy] is indicative of [her] inability to parent.

13

A-5369-18T3

It is the opinion of this evaluator, within a reasonable degree of psychological certainty that the totality of available information suggests that [Amy] is unlikely to become a viable parenting option for [Tommy] in the foreseeable future.

The trial court's acceptance of that unrebutted opinion also supports a finding of harm engendered, not only by Amy's inability to parent, but by her long and continual absences from Tommy's life because of her many attempts—and failures—to free herself from the grip of cocaine and other drugs. See K.L.F., 129 N.J. at 43-44; D.M.H., 161 N.J. at 379. All that time, Tommy was cared for, not by his mother, but by resource parents. And the record reveals Amy frequently missed visits with Tommy, last visiting him on July 3, 2019, despite having Division-provided transportation. The Division's evidence, including Amy's admissions, as found by the trial court from competent evidence it deemed credible, amply proved the first statutory prong.

As is common, the proofs relating to the first and second prongs dovetail. N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). The common proofs in this case support the trial court's findings regarding the second prong which requires the Division to "demonstrate that the parent is 'unable to eliminate the harm facing the child or is unable . . . to provide a safe and stable home for the child' . . . . before any delay in permanent

placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001) (first alteration in original) (quoting N.J.S.A. 30:4C-15.1(a)(2)).

> [T]he second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care . . . with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

Of great concern to the A.W. Court was the lack of evidence of "any realistic likelihood that the parents would ever be capable of caring for the children." 103 N.J. at 614. Even when parents are not blameworthy, parental unfitness can be established when their behavior "indicates a further likelihood of harm to the child in the future." Id. at 616.

The trial court properly considered evidence, including Dr. Stilwell's opinion, that Amy was unable to correct her "conduct within the reasonably foreseeable future." N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018). That evidence proved that the harm to Tommy would continue because Amy was unable or unwilling to overcome or remove it, thus satisfying the second prong. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506-07 (2004).

Amy failed to avail herself of the provided services to address her co-occurring problems and her resultant failure to consistently provide a safe and stable home for Tommy. As Dr. Stilwell testified, Amy's entwined substance abuse and mental health issues "negatively impact[ed] her prognosis." Her absence from Tommy's life necessitated alternate caregivers, chiefly B.H. who consistently stepped into the breach to care for Tommy and provide support for Amy. The trial court considered Amy's conduct and Dr. Stilwell's opinion that Amy was not, nor in the foreseeable future would be, a source of permanency. See K.H.O., 161 N.J. at 348-49, 363 (holding the second prong may be met by showing "that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm," or "that the child will suffer substantially from a lack of stability and a permanent placement and from the disruption of her bond with foster parents").

The court also adopted Dr. Stilwell's view that Tommy would suffer a traumatic loss that would produce significant and enduring harm which Amy could not mitigate if he was separated from his psychological parent, B.H. This evidence supported the court's conclusion that the Division proved the second prong. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (recognizing "harms attributable to a biological parent

include the prolonged inattention to a child's needs, which encourages the development of a stronger, 'bonding relationship' to foster parents, 'the severing of which would cause profound harm'" (quoting In re Guardianship of J.C., 129 N.J. 1, 18 (1992))). As our Supreme Court held in K.H.O., 161 N.J. at 348-49, harm may be "shown [by proof] that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm." Importantly, "[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483-84 (App. Div. 2012) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div. 2007)).

Amy also argues the Division failed to prove part of the third statutory prong because it failed to make a good faith effort to investigate relatives to care for Tommy after his removal in May 2017. She claims the Division began its investigation nearly two years later, when the court ordered it to investigate relatives that she submitted when the Division "finally made . . . a request in February 2019." She contends the delay contravened the Division's statutory obligation to "initiate a search for relatives who may be willing and able to

provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a). She argues the Division, in compliance with that statute, should have initiated a search for relatives within thirty days after it took custody of Tommy.

The argument overlooks the Division's efforts as found by the trial court. Within a week after the court granted the Division care, custody and supervision of Tommy after his first removal in May 2014, Tommy was placed with B.H., who hosted visits between Amy and Tommy while Amy attended her program. The Division placed Tommy with paternal grandmother, A.F., in September, 2014, but had to move him back with B.H. in August 2015, until he was placed with a new resource parent the next month.

In December 2015, after Amy resigned from her job, she was asked her plans for supporting Tommy after reunification; among the resources she cited were both B.H. and A.F. She also noted their continued support through 2016.

With this contextual background, we are unsurprised that Amy did not object to or press for an alternate placement after Tommy was placed with B.H. after the second removal. The record is bereft of any request by Amy or her counsel for an alternate placement while Amy attempted to address her issues. We note as late as April 2018, that the permanency plan was to reunite mother

and son.  Meanwhile, B.H. continued to host visits between the two through February 2019.

In January 2019, Amy disagreed with the modified Division goal of adoption and refused to supply names when the Division requested family members with whom Tommy could be placed.  Her counsel supplied names and phone numbers for Amy's sister, W.W., and her aunt, J.L., to the court on January 24, 2019.[5]

The Division contacted J.L. on February 11, 2019, and ordered background checks.  J.L. reported she had been incarcerated in 1989 on a drug charge.  On May 1, 2019, the Division requested that she provide court dispositions and written explanations of her criminal record.  During an in-office assessment on May 17, 2019, the Division reiterated the need for the requested documents.  When the documents were not submitted, the Division wrote a letter to J.L. on June 3, 2019, requesting she send the specifically-detailed documents within ten days.  Although J.L delivered some documents to the Division office

---

[5] Amy does not argue the Division failed to satisfy the third prong with regard to its investigation of A.F. or a possible placement in New York.  As the trial court found, A.F. was ruled-out because she was unable or unwilling to care for Tommy because of her health and inadequate space in her home; and an investigation of the New York home revealed "serious violations in the home environment."

on June 7, after review, it was explained what documents were missing. The Division followed that explanation with a telephone call to J.L. on June 11.

Similarly, the Division called W.W. on February 11, 2019, and left a message. A letter to her sent on April 9, 2019 was returned on May 6, and the Division called and left another message.[6] When the Division finally spoke to W.W. on May 17, it requested documents relating to her criminal background. The request was reiterated during a telephone call on June 4; the Division followed that same day with a letter detailing the required documentation. Not having received the documents, the Division repeated the request in a telephone call on June 11, 2019.

After the Division received Dr. Stilwell's report in June 2019, the Division called J.L. on June 20 and advised she was being ruled out in Tommy's best interests because the doctor opined Tommy would suffer loss and harm if removed from B.H.; J.L. had yet to supply all requested documentation. The Division also called W.W. that same day to advise her she was being ruled out

---

[6] In its written decision, the trial court noted a Division caseworker admitted during her trial testimony that a letter sent to W.W. "listed the wrong address and the child indicated on the second page was not [Tommy]. Nonetheless, the court [found] credible [the caseworker's] explanation that she subsequently provided a letter to [W.W.] and spoke with her." It is unclear to which letter the court was referring.

A-5369-18T3

because she had not submitted the required documentation; her voice mailbox was full.

The Division's actions fairly met the "important objective of the statutory scheme[: the] 'prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care.'" N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 81 (App. Div. 2013) (quoting N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011)). The Division's investigation, begun in early February after counsel's disclosure in late January—following Amy's refusal earlier that month to name relatives—could have been completed by the July trial date had J.L. and W.W. cooperated. In any event, we cannot conclude the Division embarked "on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements," a practice we decried in J.S. Ibid. (quoting K.L.W., 419 N.J. Super. at 580). In J.S., we held the Division is required to promptly "conduct a fair investigation" of any identified relative:

> The Division cannot ignore such a relative's timely application out of bureaucratic inertia, or consider that application based upon an arbitrary, preordained preference for the foster placement. The Division must perform a reasonable investigation of such relatives

that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency.

If, hypothetically, the Division has been lax or capricious in its assessment of such timely-presented alternative caretakers, it bears the litigation risk that a Family Part judge will conclude, under N.J.S.A. 30:4C-15.1(a)(3), that it has failed to prove by clear and convincing evidence that "alternatives to termination of parental rights" have been appropriately considered.

[Id. at 87.]

This, however, was not the case where the Division failed to investigate a timely-disclosed relative. To be sure, "alternatives to termination of parental rights" were considered as required by N.J.S.A. 30:4C-15.1(a)(3).

N.J.S.A. 30:4C-12.1, in addition to requiring the Division to search for and assess relatives after it accepts a child in its custody, allows the Division "to pursue the termination of parental rights if [it] determines the termination of parental rights is in the child's best interests." N.J.S.A. 30:4C-12.1(c). According deference to the Division's interpretation of the "best interests" language in the statute, we determined the statute did not create a "presumption in favor of placing children with competent and willing relatives. . . . The reality is that, no matter how fit or willing a proposed relative may be, a child will, in some instances, be better off remaining in a successful foster placement." J.S., 433 N.J. Super. at 85.

The reality is present in this record. As we already noted, Dr. Stilwell opined that breaking the bond between Tommy and B.H. would not be in his best interests. Certainly, neither J.L. nor W.W. had any significant bond with Tommy. And, considering their failure to submit documentation regarding their respective criminal histories, it is unknown if they were qualified as resource parents. Inasmuch as "there is no legal presumption in favor of a child's placement with relatives," id. at 88, and Amy was not in any position to parent Tommy, there is no evidence to controvert Dr. Stilwell's opinion, as adopted by the trial court, that it was in Tommy's best interests to remain with B.H.

The Division satisfied the fourth prong through Dr. Stilwell, who, the evidence proves, was "a 'well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both [her natural parent] and [her resource] parent[]." M.M., 189 N.J. at 281 (quoting J.C., 129 N.J. at 19). Finding Dr. Stilwell's testimony credible, the trial court evaluated the strength of Tommy's relationship to both Amy and B.H., the relative harm that would befall Tommy if he was removed from one or the other and the ability of each to ameliorate that harm. See K.H.O., 161 N.J. at 355. The court found compelling the strength of the bond between Tommy and B.H. and B.H.'s ability to ameliorate any harm caused by

the termination of Amy's thin bond with Tommy. The court quoted Dr. Stilwell's observation: "Preserving [Tommy's] relationship with his only consistent caregiver would likely serve to mitigate any reaction, not significant or enduring, he may experience through the loss of another relationship. In actuality, due to [Amy's] behavior, her relationship with [Tommy] has already begun to be severed." The court's decision was amply supported by Dr. Stilwell's testimony and recognized that "a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453.

We recognize the trauma that Amy suffered during her life. But contrary to her argument that she is a "beleaguered parent with an uneven track record," Amy has a consistent track record of inability to address the demons that have been visited upon her, perhaps by that trauma, and also visiting those demons on Tommy, directly by drug use while in her care and indirectly by her absence as a mother providing safety, security and permanency in his life.

We determine Amy's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). These include her argument, not raised to the trial court, that Dr. Stilwell rendered a net opinion. The trial court described in detail the doctor's record review, interviews,

24

behavioral observations and interpretation of administered psychological tests used in reaching her opinions. The court's findings and our review of Dr. Stilwell's comprehensive nineteen-page, single-spaced report leads us to conclude the doctor set forth "the whys and wherefores rather than bare conclusions"; hence she did not render a net opinion. <u>Beadling v. William Bowman Assocs.</u>, 355 N.J. Super. 70, 87 (App. Div. 2002).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION